1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joseph S. May   SBN 245924
LAW OFFICE OF JOSEPH S. MAY
22 Battery Street, Suite 810
San Francisco, CA 94111
Telephone (415) 781-3333
Facsimile (415) 398-1414
joseph@josephmaylaw.com

Attorney for Plaintiff
ROGELIO HECHAVARRIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ROGELIO HECHAVARRIA,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; ELIAS GEORGOPOULOS; ANTONIO PARRA; JAMES LEE; and DOES 1-50, inclusive.<br><br>                    Defendants. | CASE NO.: C10-525-CRB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      September 10, 2010<br>Time:     10:00 a.m.<br>Place:    Courtroom 8, 19th Floor<br><br>Action Filed:  February 5, 2010<br>Trial Date:     None set |

1

**TABLE OF CONTENTS**

2

3   TABLE OF AUTHORITIES.........................................................................iii

4   ISSUES PRESENTED................................................................................1

5   OVERVIEW.............................................................................................1

6   FACTS.....................................................................................................2

7       I. SGT. GEORGOPOULOS'S HISTORY OF VIOLENT,
          AGGRESSIVE, THREATENING, AND HARASSING BEHAVIOR.........................2

8           A. [Submitted with Motion for Leave to File Under Seal]....................3

9           B. The Linda Colfax Incident...................................................3

10          C. [Submitted with Motion for Leave to File Under Seal]....................3

11          D. [Submitted with Motion for Leave to File Under Seal]....................3

12          E. The Rene Peinado Incident.................................................4

13          F. The Abudiab Incident.......................................................4

14          G. The Green's Sports Bar Incident..........................................5

15          H. The Bertha Lathrop Sexual Harassment....................................6

16      II. THE HECHAVARRIA INCIDENTS...........................................6

17  ARGUMENT............................................................................................9

18      I. DEFENSE COUNSEL HAS AN ACTUAL CONFLICT OF INTEREST..................10

19      II. GEORGOPOULOS ACTED UNDER COLOR OF LAW..........................13

20      III. THE CITY VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS..................17

21          A. The City May Be Liable Under *Gibson* and *Bateson*.......................17

22  CONCLUSION.........................................................................................19

23

24

25

26

27

28

1

## <u>**TABLE OF AUTHORITIES**</u>

2

3

<u>**Statutes:**</u>

4

18 U.S.C. §241................................................................................................................14

5

18 U.S.C. §242................................................................................................................14

6

42 U.S.C. §1983.............................................................................................11, 13, 14, 17

7

Cal. Pen. Code §241........................................................................................................16

8

California Rule of Professional Responsibility 3-310.....................................................10

9

<u>**Cases:**</u>

10

*Abudiab v. City and County of San Francisco*, C09-1778-MHP, 2010 WL
2076022 (N.D. Cal., Apr. 12, 2010)...........................................................................14, 16

11

*Anderson v. Warner*, 451 F.3d 1063 (9th Cir. 2006).....................................................14

12

*Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988)....................................................18, 19

13

*Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476 (9th Cir. 1991)........................14, 16

14

*Dunton v. County of Suffolk*, 729 F.2d 903 (2d Cir. 1984)..............................10, 11, 12

15

*Gas-A-Tron of Arizona v. Union Oil Co. of California*, 534 F.2d 1322 (9th Cir. 1976)..............10

16

*Gibson v. City of Chicago*, 910 F.2d 1510 (7th Cir. 1990)...........................................17

17

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)..................................................................10

18

*Laws v. County of San Diego*, 219 Cal. App. 3d 189 (1990)........................................12

19

*Monell v. Dep't of Social Svcs.*, 436 U.S. 658 (1978).................................... .........11, 13

20

*Monroe v. Pape*, 365 U.S. 167 (1961)...........................................................................13

21

*Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547 (9th Cir. 1974)............................14, 15

22

*Parratt v. Taylor*, 451 U.S. 527 (1981).........................................................................13

23

*Plumeau v. School Dist. No. 40 County of Yamhill*,
130 F.3d 432 (9th Cir. 1997)..........................................................................................14

24

25

*Smiley v. Director, Office of Workers Compensation Programs*,
984 F.2d 278 (9th Cir. 1993)..........................................................................................11

26

27

28

*Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.*,
12 Cal. App. 4th 74 (1993)...............................................................................................10

*United States v. Classic*, 313 U.S. 299 (1941)..............................................................13

*United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991).....................................14, 15, 16

*Van Ort v. Estate of Stanewich*, 92 F.3d 831 (9th Cir. 1996).......................................18

*West v. Atkins*, 487 U.S. 42 (1988)...............................................................................13

1   Plaintiff Rogelio Hechavarria submits the following Opposition to Defendants' Motion

2   for  Partial Summary Judgment.

3   **ISSUES PRESENTED**

4   1. Should the conflict of interest created by the City Attorney's representation of both the

5   City and County of San Francisco and Elias Georgopoulos in regard to the color of law issue

6   require immediate disqualification of counsel, or the establishment of color of law as a remedy

7   for the clear conflict?

8   2. Based on the facts taken in a light most favorable to Plaintiff and/or Elias

9   Georgopoulos's true interests, was Elias Georgopoulos acting under color of law when he

10  assaulted Plaintiff?

11  **OVERVIEW**

12  Plaintiff sustained a broken wrist on February 12, 2008 and the facts surrounding the

13  injury are hotly contested by the parties. Plaintiff alleges that Parking Control Officer Sgt. Elias

14  Georgopoulos assaulted him in a manner that, based on the totality of the circumstances,

15  constituted an abuse of his position as a government official. The City and County of San

16  Francisco ("CCSF" or the "City") wishes to avoid a finding that its employee acted under color

17  of law or in the course of his employment, in order to avoid liability for the assault and in order

18  to preclude the Plaintiff, if he prevails, from obtaining an award of attorneys' fees. If color of

19  law is absent, the federal claims will be dismissed, the case will be re-filed in San Francisco

20  Superior Court, and Sgt. Georgopoulos will be exposed to potential liability for compensatory

21  and punitive damages for which CCSF will be required to neither defend nor indemnify against.

22  In addition, Sgt. Georgopoulos could be exposed to an award of punitive damages that CCSF

23  will be precluded from paying. On the other hand, if color of law does exist, Sgt. Georgopoulos

24  could assert entitlement to a qualified immunity defense, based on good faith conduct in the

25  course of his duties as a government official. In other words, Sgt. Georgopoulos's pecuniary

26  interest is in a determination that he acted under color of law while the City's interest is in a

27  determination that Georgopoulos did not act under color of law.

28

1    Because the City's and Georgopoulos's interests are diametrically and irreconcilably

2    opposed, the Court should decline to rule on the issue until Georgopoulos has independent

3    counsel to look after his interests. Alternatively, Plaintiff believes that because the City has

4    already caused potentially irreparable harm to Georgopoulos by arguing against his interests in

5    its motion, color of law should be established as a penalty for the City Attorney's failure to avoid

6    such an egregious conflict.

7    Plaintiff also believes that the facts, taken in a light most favorable to Plaintiff,

8    demonstrate that the actions of Sgt. Georgopoulos were committed under color of law, based on

9    the following: (1) Georgopoulos used City-issued pepper spray in carrying out the attack (2) the

10   attack arose out of the working relationship between Plaintiff, a tow truck driver, Georgopoulos,

11   a Senior Parking Control Officer, and his wife, a Parking Control Officers, (3) The attack,

12   though committed off duty, was one incident in a series of threats, harassment and attempted

13   attacks, most of which were committed while Georgopoulos was on duty, (4) Georgopoulos was

14   able to locate Plaintiff to carry out the attack through his official position, (5) Plaintiff did not

15   use physical force to stop the attack due to his fear of getting in trouble for striking a city

16   official, (6) Georgopoulos invoked his government position to avoid criminal charges for the

17   attack, and (7) Georgopoulos attacked Plaintiff due in part to his belief that he would not get in

18   trouble for it, based on several prior attacks going unpunished by the City. Additionally, if the

19   facts are taken in a light most favorable to Georgopoulos's true interests, at the time that the

20   incident occurred, Georgopoulos was acting in his capacity as a Senior Parking Control Officer,

21   who went to the City's impound lot to report Plaintiff for harassing another parking officer on

22   the job, which is activity that is arguably within the course of his employment and in furtherance

23   of his employer's interests.

## **FACTS**

24

25   ### **I. SGT. GEORGOPOULOS'S HISTORY OF VIOLENT, AGGRESSIVE, THREATENING, AND HARASSING BEHAVIOR**

26

27   On June 1, 1998 the San Francisco Department of Parking and Traffic ("DPT") hired

28   Elias Georgopoulos as a Parking Control Officer ("PCO"). [Georgopoulos Deposition (Depo.) in

1   *Abudiab v. CCSF*, N.D. Cal. Civ. No. C09-1778-MHP, 26:15-17, attached as Exhibit A to May

2   Declaration.] Georgopoulos had already engaged in violent behavior before he was hired, and

3   after he was hired, he committed many acts of violence, aggression and harassment towards

4   others, receiving virtually no punishment from the City. As the extensive history of inappropriate

5   behavior and the City's utter failure to adequately address the problem is highly relevant to

6   Plaintiff's claims (discussed *infra*), this history is outlined here.

7           **A.  [Submitted with Motion for Leave to File Under Seal]**[1]

8           **B.  The Linda Colfax Incident**

9           On or about July 14, 2000 – two years after he was hired by DPT – Sgt. Georgopoulos,

10   while on duty, had cut off Deputy Public Defender, and soon-to-be San Francisco Superior Court

11   Judge Linda Colfax, with his City-issued vehicle. (Colfax Declaration, ¶3.) Ms. Colfax told

12   Georgopoulos that he was driving like an idiot and he responded by shouting obscenities at her.

13   (Ibid., ¶4.) Georgopoulos then followed Colfax through the streets of San Francisco, at times

14   tailing her, at times pulling in front of her and hitting his brakes, and continually shouting

15   obscenities. *Ibid.* Ms. Colfax wrote a letter of complaint about Georgopoulos and received a

16   response from the DPT indicating that they could not sustain her complaint, but that if

17   Georgopoulos had future complaints, her file would be used in the determination of their

18   outcome. *Ibid.*, ¶5.

19           **C.  [Submitted with Motion for Leave to File Under Seal]**

20           **D.  [Submitted with Motion for Leave to File Under Seal]**

21

22   ─────────────────────

23   [1]Defense counsel told Plaintiff's counsel that if he referenced in this memorandum any
   information gathered from documents designated by the City as confidential, which were produced
24   in *Abudiab v. City and County of San Francisco*, C09-1778-MHP, which is another civil rights case
   against Sgt. Georgopoulos, the City Attorney's Office would "come after" Plaintiff's counsel hard
25   for sanctions. Plaintiff believes that the information is not entitled to the level of protection sought
   by the City and, even if it was, referencing relevant information in this memorandum would not be
26   inappropriate (the protective order entered in the above-referenced case specifically provides that
   "Under no circumstances shall memoranda or pleadings . . . be filed under seal"). However, out of
27   caution and in order to avoid having to oppose a sanctions motion, Plaintiff is submitting herewith
   an administrative motion for leave to file the information and documents under seal. *See generally*
28   Declaration of Joseph May.

C10-525-CRB

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

3

### E.  The Rene Peinado Incident

On March 23, 2005, Captain Rene Peinado was running a brief errand in downtown San Francisco. (Peinado Declaration, ¶1.) He left his car parked at 650 California Street while he ran in briefly. *Ibid*. When he returned he noticed PCO Georgopoulos. *Ibid*. Seeing that no ticket had been written, Peinado got in his car and prepared to leave. *Ibid*. Georgopoulos approached the front of the vehicle and told Peinado that he could not leave. *Ibid*. Peinado stated that he was in a hurry and backed up and then drove away without making any contact with Georgopoulos. *Ibid*. Georgopoulos followed Peinado in his DPT vehicle, yelling at Peinado to pull over. *Ibid*., ¶3. Georgopoulos called 911 and falsely accused Peinado of intentionally hitting him with his vehicle. *Ibid.*, ¶4, Exhibit A to Peinado Declaration.

A few days after this incident, while he was at work, Peinado was arrested, hand-cuffed, and taken into custody by the San Francisco Police. (Peinado Declaration, ¶4.) Peinado was charged with assault with a deadly weapon, hit and run, and other felony charges, all of which were dismissed by the Superior Court. *Ibid*., ¶5, Exhibit B. Mr. Peinado had serious damage done to his reputation and his driver's license, professional license issued by the U.S. Coast Guard, and federal security clearance were jeopardized as a result of Georgopoulos's fabricated charges against him. *Ibid*., ¶6. As an additional result of the false charges, Peinado was forced to expend tens of thousands of dollars and suffered serious and irreparable injuries to his reputation. *Ibid*.

### F.  The Abudiab Incident

On May 6, 2008 Georgopoulos, believing he had been cut off by a limousine driven by Amjad Abudiab, instigated a heated verbal exchange with Abudiab. *See Abudiab v. CCSF*, N.D. Cal. Civ. No. C09-1778-MHP, Dkt. No. 33 [Deposition of Amjad Abudiab at pp. 18, 20, 29-36 (Exhibit A to Declaration of Joseph May in opposition to motion for summary judgment).]. Georgopoulos followed Abudiab through the streets of San Francisco, eventually prompting Abudiab to pull over. *Ibid*., at pp. 52, 57, 63, 64. Georgopoulos threatened Abudiab with pepper spray, prompting Abudiab to get back in his car and call 911. *Ibid*., at pp. 73-75, 83-84.

1    Later that day, when Abudiab entered a nearby fast food restaurant, he noticed that

2   Georgopoulos happened to be there. *Ibid*., at pp. 110-113. Abudiab spoke to Georgopoulos for

3   about two seconds to give him a piece of his mind and exited the restaurant. *Ibid*., at pp. 127,

4   132-133. Georgopoulos followed him outside, pepper sprayed him several times, and then

5   punched him in the head. *Ibid*., at pp. 146-159. One independent witness who happens to be an

6   attorney, told the police that Abudiab was retreating from Georgopoulos when Georgopoulos

7   aggressively (and not in self defense) punched him in the head. *See Abudiab v. CCSF, supra*,

8   Dkt. No. 34, Declaration of Erik Reinertson, Exhibit A. Georgopoulos testified under oath that

9   he punched Abudiab because Abudiab lunged at him. Georgopoulos Deposition in *Abudiab v.*

10  *CCSF*, supra, 127:17-23 (Exhibit A, to May Declaration). Another independent witness testified

11  that he observed Georgopoulos pepper spray Abudiab without Abudiab making any physical

12  contact with Georgopoulos. (May Declaration, ¶7.) Despite the witness accounts, the San

13  Francisco Police officers who arrived on the scene arrested Abudiab for battery on a parking

14  control officer but the charges were dropped. Abudiab Depo, 106:20-21 (Exhibit C to May

15  Declaration.)

16          **G.  The Green's Sports Bar Incident**

17          In mid-2009 Sgt. Georgopoulos was patrolling Russian Hill on foot with his wife, PCO

18  Monica Georgopoulos when they came upon two delivery trucks delivering beer to Green's

19  Sports Bar. (Declaration of Miguel Moran, ¶2.) Elias Georgopoulos told the two truck drivers

20  that they had to move their trucks. *Ibid*. The truck drivers refused and told Georgopoulos to

21  simply give them a ticket. *Ibid*. At some point the police were called and told Georgopoulos that

22  he should let the delivery men do their jobs. *Ibid*. Soon after the police and the PCOs left,

23  Georgopoulos returned with Monica and tried to start a fight with Miguel Moran, one of the

24  drivers. *Ibid*. Moran did not engage and no fight actually broke out. *Ibid*. However, when Moran

25  got back to work after his shift, he learned that Georgoopulos called his supervisor to complain

26  that Moran had tried to start a fight with Georgopoulos. *Ibid*., at ¶3. After that, Moran began to

27  receive unwarranted and undeserved parking tickets issued by Monica Georgopoulos, including

28  a citation for parking in a bus lane, which is a serious offense, and which caused Moran to get in

C10-525-CRB
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

5

1    trouble at work. *Ibid*., ¶4. Several of these tickets were not placed on Moran's windshield, which

2    precluded him from contesting the tickets within the deadline to do so. *Ibid*.

3                    **H.  The Bertha Lathrop Sexual Harassment**

4           Shortly after PCO Bertha Lathrop began working for DPT, her supervisor, Sgt.

5    Georgopoulos, began making unwelcome sexual advances toward her. (Declaration of Bertha

6    Lathrop, ¶5.) When she told him that she did not want to have anything to do with him, he

7    threatened to write her up. *Ibid*., ¶6. Lathrop reported Georgopoulos's behavior to Human

8    Resources. *Ibid*., ¶7. She received a letter from the City's Equal Employment Opportunity office,

9    informing her that her complaint was not sustained, and that it was determined that Ms. Lathrop

10   was actually the one who initiated the flirtatious conduct and that Georgopoulos's behavior did

11   not constitute sexual harassment. *Ibid*., ¶8. At some point, Ms. Lathrop was told that

12   Georgopoulos was instructed to avoid contact with her. *Ibid*., ¶9. However, in the Summer or

13   Fall of 2009 Georgopoulos cited Ms. Lathrop for not wearing her helmet. *Ibid*., ¶ 10. Ms.

14   Lathrop does not believe Georgopoulos was ever reprimanded for sexually harassing her. *Ibid*.,

15   ¶12.

16        **II.   THE HECHAVARRIA INCIDENTS**

17          In 2007 and until a few months before the February 12, 2008 incident, Plaintiff was

18   having a romantic relationship with Monica Georgopoulos. (Hechavarria Depo, 72:22-73:5.) On

19   a number of occasions prior to the incident, Georgopoulos threatened Plaintiff while

20   Georgopoulos was on duty, in uniform, operating his City-issued vehicle. *Ibid*., 150:2-151:24.

21   These threats began when Georgopoulos apparently learned of Plaintiff's involvement with

22   Monica Georgopoulos by intercepting a text message that Plaintiff had sent to her. *Ibid*., 115:25-

23   116:21. Georgopoulos sent a text message on his ex-wife's phone to Plaintiff telling him that

24   Georgopoulos has the phone and that Plaintiff shouldn't text her anymore. *Ibid*., 116:16-117:17.

25   Soon after intercepting the text message, Georgopoulos, while on duty, threatened Plaintiff,

26   telling him he was going to get him. *Ibid.*, 119:23-120:9.  The next incident was when Plaintiff

27   was on duty at California and Davis Streets in San Francisco when Georgopoulos pulled up

28   alongside him in his City-issued vehicle and told him that he was going to get him. *Ibid*., 128:12-

1   25.  Hechavarria reported the incident to Auto Return, the private contractor that coordinates the

2   City's tow truck operation. *Ibid.*, 131:21-24.

3          On February 12, 2008, Sgt. Georgopoulos decided to call in sick. (Georgopoulos

4   Declaration submitted in support of Defendants' motion for summary judgment, ¶5.) He called

5   Plaintiff and told him that he was going to "fuck him up." (Hechavarria Depo, 38:3-7.) At the

6   time, Plaintiff was in his tow truck, which was parked on 7th Street in San Francisco, just outside

7   the entrance to Auto Return. *Ibid.*, 37:22-38:2. Georgopoulos pulled his yellow mustang in front

8   of Plaintiff's tow truck, directly adjacent to the Auto Return entrance. (Auto Return Security

9   Video at 13:38:48, Exhibit A to Declaration of Elias Georgopoulos in support of Defendants'

10  Motion for Summary Judgment.) Georgopoulos went over to Plaintiff's tow truck where plaintiff

11  was leaning into the truck through the driver's side door cleaning out trash. (Hechavarria Depo,

12  41:21-43:15, 60:22-61:7.) Georgopoulos grabbed Plaintiff by the shirt, pepper sprayed him in the

13  eyes, and then pulled him to the ground. *Ibid.*, 44:12-24. Plaintiff fell on his wrist, fracturing it.

14  *Ibid.*, 206:9-17. Plaintiff got up and was pepper sprayed again by Georgopoulos. *Ibid.*, 76:10-17.

15  At that point, Plaintiff moved towards Georgopoulos and Georgopoulos sprayed Plaintiff at least

16  two more times. *Ibid.*, 76:19-77:7. Plaintiff noticed that Georgopoulos was using the pepper

17  spray that the City issues all Parking Control Officers, which is black with a red sticker. *Ibid.*,

18  161:16-19.

19         Plaintiff testified that Georgopoulos must have been able to locate him (just as he had on

20  several prior occasions) by utilizing either Auto Return's or the Police Department's Tow Desk

21  resources, which allow those offices to locate any tow truck driver by the GPS on the truck's

22  radio. *Ibid.*, 64:4-23. Plaintiff also testified that he believed he would get in trouble if he tried to

23  use force to defend himself, due to the fact that Georgopoulos is a city official. *Ibid.*, 136:6-

24  140:8.

25  //

26  //

27  //

28

1    Plaintiff and Georgopoulos ended up moving back near Georgopoulos's vehicle, with

2    Plaintiff holding his broken left wrist with his right wrist, against his body. *Ibid.*, 98:20-99:7.[2] At

3    that point, two undercover San Francisco Sheriff Deputies pulled up in an unmarked car, had

4    Plaintiff stand against the fence, and told Georgopoulos that he could go, which he did. *Ibid.*,

5    100:17-23; Surveillance tape, 13:42:16.) Plaintiff reported the assault to a DPT supervisor and

6    then, with the assistance of a DPT assistant director, filed a police report. (Hechavarria Depo,

7    106:8-13, 187:18-188-8.) All documents (aside from the police incident report) related to the

8    investigation of the incident by the San Francisco Police Department, have been classified as

9    confidential by the City, whose attorney warned Plaintiff's counsel that Plaintiff's making

10   mention herein of facts gleaned from documents designated confidential by the City will prompt

11   the City to seek sanctions against Plaintiff's counsel. *See* Declaration of Joseph May, ¶9.

12   Plaintiff believes that how the City's police officers investigated the complaint and the

13   determinations they made and ultimate actions they took are potentially highly relevant to this

14   motion, and therefore if the Court is inclined to grant Defendants' motion in any respect,

15   Plaintiff seeks leave to submit additional briefing (under seal if the Court deems it proper)

16   regarding the police investigation of this incident. *See Ibid.*

17   On March 12, 2008, a hearing was held in Department 218 of the San Francisco Superior

18   Court on Cross-petitions for restraining orders – one sought by Plaintiff against Georgopoulos

19   and one sought by Sgt. Georgopoulos and his wife against Plaintiff. (*See generally* Transcript of

20   Proceedings, Ex. D to May Declaration). Georgopoulos was permitted to speak first and he

21   immediately announced that he's a DPT officer. *Ibid.*, at 1. Georgopoulos then told the judge that

22   on the day of the incident, he had gone to Auto Return to report Plaintiff to a boss, but that when

23   he tried to do so, Plaintiff confronted him and tried to punch him. *Ibid.*, at 2-3. In response,

24   Georgopoulos testified, he pushed Plaintiff, causing him to fall back and break his wrist. *Ibid.* at

25   3. He further testified that he punched Plaintiff and then Plaintiff came towards him, stuck both

26

27

28   [2]Defendants insist that the surveillance footage depicts Plaintiff with his hands in his pocket, but after reviewing the footage several times, it does not seem clear where Plaintiff's hands were.

C10-525-CRB

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  hands in his pockets, leading Georgopoulos to believe that Plaintiff had a knife, which in turn led

2  Georgopoulos to use his "own personal pepper spray." *Ibid*.

3    At the hearing on the petitions for restraining orders, Plaintiff testified as he had at his

4  deposition in this matter: he was in his tow truck when Georgopoulos came up from behind,

5  grabbed him, pepper sprayed him and pulled him to the ground, resulting in a broken wrist. *Ibid*.

6  at 4-5. The judge granted Georgopoulos's petition, and a restraining order issued prohibiting

7  Plaintiff from contacting Georgopoulos. *Ibid*. at 7.

8    Despite the fact that Georgopoulos obtained a restraining order against Plaintiff, he

9  continued to approach Plaintiff while on duty, in uniform, and operating his City-issued vehicle,

10  and threaten him or challenge him to fight. The first such incident occurred when Georgopoulos

11  cut in front of Plaintiff, who was in his tow truck, causing Plaintiff to almost hit another vehicle.

12  (Hechavarria Depo, 79:1-24.) Georgopoulos pulled alongside Plaintiff and shouted obscenities

13  and challenged him to fight. *Ibid*., at 81:20-82:19.  The next incident occurred when Plaintiff and

14  a fellow tow truck driver were getting food at a gas station at 8th and Harrison Streets in San

15  Francisco, when they noticed Georgopoulos approach. *Ibid*., 122:9-12, 124:15-21. Plaintiff told

16  his friend that they needed to leave because he did not want a confrontation with Georgopoulos.

17  *Ibid*., 124:22-23. Plaintiff and his colleague each got in their respective tow trucks and left, but

18  Georgopoulos followed Plaintiff's truck, pulled alongside him and shouted obscenities and told

19  him to get out of his truck, challenging him once again to fight. *Ibid.*, 124:24-125:11. On another

20  occasion, Georgopoulos showed up behind Plaintiff's tow truck and told him something to the

21  effect of "I can do whatever I want with you . . . I told you I can do whatever I want with you,

22  motherfucker." *Ibid*., 235:8-23. Yet another incident occurred shortly before Plaintiff's June 24,

23  2010 deposition, when Georgopoulos was in his private vehicle and threw a water bottle at

24  Plaintiff, who was working at the time. *Ibid*., 156:7-157:17.

25             **ARGUMENT**

26  **I.  DEFENSE COUNSEL HAS AN ACTUAL CONFLICT OF INTEREST**

27    The Complaint alleges that Defendant Georgopoulos acted under color of state law, to

28  deprive Plaintiff of his Constitutional rights. The Complaint also alleges that Defendant City and

C10-525-CRB

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  County of San Francisco is liable because it caused the constitutional violation through its policy

2  of protecting Georgopoulos.  If it is determined that Sgt. Georgopoulos was acting under color of

3  law at the time of the subject incident, and in good faith, pursuant to the City's policies, he could

4  benefit from the defense of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818-19

5  & n.30 (1982).  The City, on the other hand, enjoys no such defense. If it were determined that

6  Georgopoulos acted within the scope of his employment during the subject incident, the City

7  would have to indemnify him against any judgment rendered against him. However, if it were

8  determined that Georgopoulos was acting outside the scope of his employment, it would provide

9  the City with a defense to the action, and would leave Georgopoulos open to personal liability.

10      California Rule of Professional Responsibility 3-310 clearly and strictly prohibits an

11  attorney from representing two clients whose interests are adverse to one another. *Tsakos*

12  *Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.*, 12 Cal. App. 4th 74, 97 (1993)

13  (holding that where there is an actual conflict, a party may not consent to dual representation of

14  conflicting interests at trial.) Because Defendants' summary judgment motion creates an actual

15  conflict of interest, this Court has the power to disqualify defense counsel. The United States

16  Court of Appeal for the Ninth Circuit, in *Gas-A-Tron of Arizona v. Union Oil Co. of California*,

17  534 F.2d 1322, 1324-25 (9th Cir. 1976), has adopted the position that

18          Whenever an allegation is made that an attorney has violated his moral and
           ethical responsibility, an important question of professional ethics is raised.
19          It is the duty of the district court to examine the charge, since it is that court
           which is authorized to supervise the conduct of the members of its bar. The
20          courts, as well as the bar, have a responsibility to maintain public
           confidence in the legal profession. This means that a court may disqualify
21          an attorney for not only acting improperly but also for failing to avoid the
           appearance of impropriety.

22      Based on almost identical facts to those before the Court, the U.S. Court of Appeals for

23  the Second Circuit held that where an officer and the employing municipality are sued jointly,

24  and where a question is presented as to whether the officer acted under color of law, a serious

25  and actual conflict immediately arises requiring disqualification of counsel. *Dunton v. County of*

26

27

28

1   *Suffolk*, 729 F.2d 903, 907 (2d Cir. 1984).[3] In *Dunton*, the plaintiff escorted Mrs. Pfeiffer to her

2   car after a party. 729 F.2d at 905. Mrs. Pfeiffer claimed that Mr. Dunton made unwelcome sexual

3   advances towards her; Mr. Dunton claimed that their interaction was mutual. *Id*. At any rate, Mr.

4   Pfeiffer, a police officer employed by Suffolk County, came upon Mr. Dunton and Mrs. Pfeiffer

5   in Mrs. Pfeiffer's car, threw Dunton out, struck him repeatedly, and left him lying in the parking

6   lot. *Id*. Dunton brought suit against Mr. Pfeiffer pursuant to 42 U.S.C. §1983, claiming that he

7   was acting as a police officer when he committed the alleged assault. *Id*. at 906. Dunton also

8   sued Suffolk County under a *Monell* theory. *Id*.

9       The Suffolk County Attorney defended both Pfeiffer and the County in the lawsuit and

10  asserted an affirmative defense in the answer that Pfeiffer was entitled to qualified immunity. *Id*.

11  However, at trial, the County Attorney argued that Pfeiffer "acted as a husband, not even as an

12  officer" and that he "was acting as an irate husband rather than a police officer." *Id*. The jury

13  found Pfeiffer liable only on the state law battery claim and awarded compensatory and punitive

14  damages. *Id*. On appeal, Pfeiffer argued that he was not given a fair trial because his attorney

15  undermined his qualified immunity defense, which would only have been available if he was

16  acting in good faith within the scope of his employment. *Id*. at 907.

17      The Second Circuit reversed and remanded, finding that the disqualifying conflict arose

18  when the County Attorney asserted that Pfeiffer was not acting under color of law. *Id*. ("This

19  was a good defense for the county, which eventually was dismissed from the action. However, it

20  was not in the best interest of Pfeiffer, who was ultimately found liable in his individual

21  capacity."). The Second Circuit went on to find that even though the county agreed to indemnify

22  Pfeiffer for compensatory damages, a jury that was properly presented with the argument that

23  Pfeiffer was acting in the scope of his employment and in good faith may not have awarded

24  punitive damages. *Id*. at 909. Therefore, when the attorney for the county argued on behalf of all

25

26      [3]The Ninth Circuit cited *Dunton* with approval in *Smiley v. Director, Office of Workers*

27  *Compensation Programs*, 984 F.2d 278, 282 (9th Cir. 1993), for the proposition that "[i]t is well-
    settled that courts have the power to enforce the rule against representing adverse interests to assure

28  fairness and the proper administration of justice."

1  defendants that Pfeiffer was acting outside the scope of his employment, he acted contrary to

2  Pfeiffer's interest by exposing Pfeiffer to punitive damages that might not have otherwise been

3  awarded. *Id*. at 909-10.

4      *Dunton* has been distinguished but has not been overruled. In *Laws v. County of San*

5  *Diego*, 219 Cal. App. 3d 189 (1990) sheriff's deputies who were sued along with their municipal

6  employer in a civil rights action argued that the County should have to provide them with

7  independent counsel. They had cited *Dunton* to support their position. The California Court of

8  Appeal found that *Dunton* was inapposite as there was no dispute in *Laws* whether the deputies

9  were acting under color of law. 219 Cal. App. 3d at 198-99 n.12. The Court explained that

10 *Dunton* involved a public entity's attorney, who represented the entity and an officer, and argued

11 that the officer was not acting under color of law but as an "irate husband." *Id*. The *Laws* Court

12 stated that "[s]uch egregious facts are simply not present here." While those "egregious" facts

13 were not present in *Laws*, those "egregious" facts are present here. The City Attorney's claim

14 that Georgopoulos "was acting exclusively for a personal reason – to stop Plaintiff from

15 harassing his wife" (Def. Motion, 12:6-7) is tantamount to asserting that he was acting as an

16 "irate husband.")

17     Just as in *Dunton*, there is a question whether Sgt. Georgopoulos's actions were under

18 color of law and the City's attorney is strenuously arguing that Georgopoulos was acting as an

19 irate husband and not as a city official. However, based on Georgopoulos's Declaration, on the

20 day of the subject incident, he may well have been acting in his capacity as a Senior Parking

21 Control Officer by going to Auto Return, a City-contractor, to lodge a complaint against a tow

22 truck driver in order to protect one of his officers (who just happened to be his ex-wife) from

23 what Georgopoulos believed to be on-the-job harassment. It is also arguable, therefore, that

24 Georgopoulos's actions on February 12, 2008 were in furtherance of the City's objectives. If Sgt.

25 Georgopoulos were represented by independent counsel, he would surely be arguing that the act

26 of going to Auto Return on February 12, 2008 and the resulting incident with Plaintiff were

27 made in good faith and in the scope of his employment as a San Francisco Senior Parking

28 Control Officer. Such an argument would preserve Georgopoulos's qualified immunity defense.

C10-525-CRB
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1    Meanwhile, the City is strenuously arguing that color of law was absent, which is in the City's

2    best interest as it could help the City avoid liability. This conflict should require disqualification

3    of the City Attorney's Office from representing Sgt. Georgopoulos. The Court should provide an

4    opportunity for Sgt. Georgopoulos to obtain independent counsel to argue the color of law issue

5    on his behalf. Alternatively, because the City has been arguing that Georgopoulos has not acted

6    under color of law, which may have caused irreparable damage to a potential qualified immunity

7    defense, the only way to fully avoid the problem may be to estop the City from arguing that there

8    was an absence of color of law.

9            **II.     GEORGOPOULOS ACTED UNDER COLOR OF LAW**

10           Regardless of whether the Court disqualifies counsel due to the above-described conflict

11   of interest, Plaintiff alleges that the facts adduced thus far, taken in a light most favorable to

12   Plaintiff, show that Plaintiff states a valid federal civil rights claim. To establish a *prima facie*

13   claim under 42 U.S.C. Section 1983, Plaintiff must show that (1) the defendant was "acting

14   under color of state law," and (2) the defendant's action resulted in a deprivation of his

15   Constitutional or federal statutory right.[4] *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). A

16   government employee acts under color of state law when he "exercise[s] power 'possessed by

17   virtue of state law and made possible only because the wrongdoer is clothed with the authority of

18   state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S.

19   299, 326 (1941)). A defendant acts under color of state law "when he abuses the position given

20   to him by the State." *Id.* at 50. Even if the wrongful acts are committed without actual authority,

21   color of state law may still exist. *Monroe v. Pape*, 365 U.S. 167, 171 (1961), *overruled on other*

22   *grounds by Monell v. Dep't of Social Svcs.*, 436 U.S. 658 (1978) (Fourteenth Amendment applies

23   to "those who carry a badge of authority of a State and represent it in some capacity, whether

24   they act in accordance with their authority or misuse it").

25

26           [4]The right to bodily integrity is protected by the Fourteenth Amendment's Due Process

27   clause, and assaults by government officials are analyzed under this Amendment. Defendant does
     not seem to argue that an assault cannot be a Constitutional deprivation, but rather Defendant argues

28   that Georgopoulos's assault was not committed under color of state law.

C10-525-CRB
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

A Section 1983 claim alleging an intentional assault committed under color of state law is not limited to claims against police officers. *See, e.g., Plumeau v. School Dist. No. 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (student's substantive due process right included freedom from "excessive physical abuse by school employees"); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir. 1991) (affirming judgment against Washington State Employment Security office employee who sexually assaulted female Laotian refugees seeking job placement); *Abudiab v. City and County of San Francisco*, C09-1778-MHP, 2010 WL 2076022 (N.D. Cal., Apr. 12, 2010) (Georgopoulos's May 6, 2008 assault against a limousine driver was committed under color of law). Whether a government employee was "acting under color of state law" is dependent on the specific facts of a case. *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547, 550 (9th Cir. 1974) ("[T]here is no rigid formula for measuring state action for purposes of section 1983 liability. Rather, it is a process of 'sifting facts and weighing circumstances' which must lead us to a correct determination.").

The fact that Georgopoulos called in sick the day he assaulted Plaintiff does not preclude a finding that he acted under color of law. *Anderson v. Warner*, 451 F.3d 1063 (9th Cir. 2006) (off duty custodial officer acted under color of law when he assaulted motorist who rear-ended him). An analogous factual scenario was presented by *United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991). In *Tarpley*, the defendant appealed his conviction for violation of 18 U.S.C. §§241 and 242, which prohibit deprivation of an individual's constitutional rights under color of law. Tarpley, a deputy sheriff, learned that his wife had been having an affair with Vestal. 451 F.3d at 807. Tarpley had his wife lure Vestal to their house and when Vestal arrived, Tarpley attacked him. *Id*. at 807. During the attack, Tarpley inserted a service pistol into Vestal's mouth and told Vestal that he was a sergeant and could kill Vestal and "get away with it." *Id*.

On appeal, Tarpley argued that he was not acting under color of law, but instead "acting as a jealous husband, not as a police officer." *Id*. at 809.  The United States Court of Appeals for the Fifth Circuit affirmed the district court's conviction, finding that during the assault, Vestal "claimed to have special authority for his actions" and that the "air of official authority pervaded the entire incident." *Id*.

1    In the present case, Georgopoulos blatantly threatened Plaintiff while on duty several

2    times prior to the assault, and continued to do so after the assault. On one such occasion, after

3    the assault, Georgopoulos told Plaintiff "I told you I can do whatever I want with you,

4    motherfucker." (Hechavarria Depo, 235:8-23.) Georgopoulos's statement was accurate, as shown

5    by his ability to essentially do whatever he wants to whomever he wants and get away with it.

6    Georgopoulos has harassed, threatened, assaulted, and otherwise harmed, many people and has

7    never faced any serious consequences for his action. The City protects Georgopoulos from any

8    repercussions and helps him avoid punishment. By helping Georgopoulos actually "get away

9    with" all of his wrongful acts, the City has essentially ratified Georgopoulos's conduct and,

10   knowing the City will continue to insulate him from any consequences, Georgopoulos carries out

11   blatantly wrongful acts in what can only be characterized as an abuse of his position.

12   Georgopoulos successfully uses the same tactic over and over again: he threatens,

13   harasses, or attacks someone and then promptly makes a report alleging that he, Georgopoulos,

14   was actually the victim. He implemented his *modus operandi* with Linda Colfax, Rene Peinado,

15   Bertha Lathrop, Amjad Abudiab, Plaintiff, Miguel Moran (and the other beer truck drivers

16   working with him), and others (*see* supplemental facts submitted with motion for leave to file

17   documents under seal). Knowing that his version of events will be believed each time because he

18   is a ranking city official, Georgopoulos continues to carry out wrongful acts with impunity.

19   Similar to the situation in *Tarpley*, Plaintiff contends that as a result, an "air of official authority

20   pervade[s] the incident[s]." *Tarpley*, 945 F.2d at 809. Viewing the converse may be helpful here:

21   if Georgopoulos were not a Sergeant and Senior Parking Control Officer with the DPT, he would

22   have long ago been locked up for his behavior. Instead, every time he hurts someone, they are

23   the one more likely to get in trouble. In the present case, Georgopoulos continues to threaten and

24   harass Plaintiff knowing that his story will always be believed before that of a tow truck driver.

25   As Georgopoulos himself stated: he can do whatever he wants to Plaintiff.

26   As the determination as to color of law requires the weighing of all the facts and

27   circumstances of a case (*Ouzts v. Maryland Nat'l Ins. Co.*, *supra*, 505 F.2d at 550), Plaintiff

28   suggests that the following factors, when considered together, lead to the determination that

C10-525-CRB
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
15

1   Georgopoulos's February 12, 2008 attack against Plaintiff was carried out under color of law: (1)

2   Plaintiff, as a tow truck driver, was brought into contact with Georgopoulos and his wife due to

3   Georgopoulos's position as a City Official [*See Vang v. Toyed*, *supra*, 944 F.2d 476, 480 (9th

4   Cir. 1991) (color of state law existed when state employee sexually assaulted Hmong refugees

5   with whom he came into contact due to his official position)], (2) the attack was one incident in a

6   series of harassment, threats and attempted attacks against Plaintiff, most of which occurred

7   while Georgopoulos was in uniform, on duty, and driving his City-issued vehicle, (3)

8   Georgopoulos located Plaintiff by using resources only available to him by virtue of his official

9   position (more discovery may be needed on this issue; however, whether Georgopoulos actually

10  located Plaintiff by using City resources will likely be a question of fact); (4) Georgopoulos used

11  City-issued pepper spray in carrying out the attack [*see, e.g.*, *United States v. Tarpley*, *supra*, 945

12  F.2d 806 (use of government issued weapon by off-duty officer important in finding color of

13  law)][5]; (5) Plaintiff did not defend himself from the ensuing assault for fear of getting in trouble

14  for hitting a parking officer (*See* Cal. Pen. Code §241, which provides a doubled fine for

15  assaulting a parking officer; *see also Abudiab v. City of San Francisco, supra*, 2010 WL

16  2076022 (N.D. Cal., Apr. 12, 2010) ("When a private citizen refrains from exercising a legal

17  right out of intimidation of a state actor, that state actor could have acted under color of law."

18  [Citation omitted]); (6) Georgopoulos carried out many prior attacks or attempted attacks

19  knowing that his version of events would be accepted due to his official position; (7)

20  Georgopoulos invoked his official position to escape punishment for committing the assault; (8)

21  Plaintiff complained to Auto Return, which, as a contractor, is an agent of the City, that

22  Georgopoulos had been threatening him prior to the attack; and (9) the City acquiesced in and

23  ratified the attack by failing to conduct its own investigation or take any remedial action.

24

25

26
            [5]Georgopoulos admits that the pepper spray he used was black with a red sticker, which is

27  what City-issued pepper spray looks like, but presents no evidence (other than his testimony) that
    his black and red pepper spray was purchased for his own private use. Georgopoulos Deposition in

28  *Abudiab v. CCSF*, 206:11-15, attached as Exhibit A, to May Declaration.

1

### III. THE CITY VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHTS

2

#### A. The City May Be Liable Under *Gibson* and *Bateson*

3      Even if Georgopoulos's actions were not under color of law, the City may be liable for

4   directly violating Plaintiff's constitutional rights. *Gibson v. City of Chicago*, 910 F.2d 1510,

5   1519-20 (7th Cir. 1990). In *Gibson*, the Plaintiff's decedent was shot and killed by a Chicago

6   police officer who had been deemed mentally unfit for duty but whose City-issued firearm and

7   ammunition were never confiscated. 910 F. 2d at 1512. The plaintiff brought Section 1983

8   claims against the officer and the City of Chicago. The Seventh Circuit upheld the order of the

9   District Court for the Northern District of Illinois granting the individual officer's motion to

10  dismiss the Section 1983 claim due to the absence of color of state law. *Id*. at 1519. However,

11  the Seventh Circuit reversed the grant of summary judgment in favor of the City of Chicago on

12  Plaintiff's Section 1983 claim. The Court concluded that a finding that the individual officer did

13  not act under color of state law did not compel the conclusion that the City could not be

14  independently liable under Section 1983:

15          Mr. Gibson has alleged a municipal policy of inadequate procedures
             regarding the recovery of a deadly weapon and ammunition from an officer
16           placed on medical leave as mentally unfit for duty. He also has alleged that
             the failure to promulgate adequate procedures constituted "deliberate
17           indifference" to the rights of the decedent and was the cause of the
             decedent's death in deprivation of his constitutional rights. [Citation.] On a
18           municipal liability claim, the City policy itself must cause the constitutional
             deprivation. Therefore, the municipality itself is the state actor and its
19           action in maintaining the alleged policy at issue supplies the "color of law"
             requirement under §1983. In short, under this theory of liability, Gibson
20           contends that the City's policy of allowing a deranged police officer to
             retain his service revolver and bullets is the state action that deprived him of
21           his life. Consequently, the City is not entitled to summary judgment on the
             ground that [Officer] Novit did not act under color of state law.

22

*Id*. at 1519-20.

23

24      Plaintiff's Section 1983 claim against CCSF in the present case is similar to that of the

    plaintiff in *Gibson*. Plaintiff claims that CCSF knew of Sgt. Georgopoulos's violent and
25
    dangerous behavior and failed to reprimand or terminate him, failed to confiscate his pepper
26
    spray, and even assisted him in avoiding any negative consequences for his actions, effectively
27
    confirming Georgopoulos's belief that he can carry out acts of aggression and violence and get
28

1   away with them.[6] CCSF's repeated actions in this regard constitute a custom and policy of

2   deliberate indifference to the rights of Plaintiff. Moreover, the City's actions caused

3   Georgopoulos to believe he could continue to attack others with impunity and encouraged him to

4   in fact do so.

5        In order to show that the City is directly liable for Plaintiff's Constitutional deprivation,

6   Plaintiff must show that the City's policy of protecting Georgopoulos proximately caused

7   Plaintiff's injury. *Bateson v. Geisse*, 857 F.2d 1300, 1304 (9th Cir. 1988) ("The requisite causal

8   connection can be established not only by some kind of direct personal participation in the

9   deprivation but also by setting in motion a series of acts by others which the actor knows or

10  reasonably should know would cause others to inflict the constitutional injury."). *Van Ort v.*

11  *Estate of Stanewich*, 92 F.3d 831 (9th Cir. 1996), a case relied on heavily by Defendants,

12  involved a police officer's off duty burglary and assault, which was found not to be undertaken

13  under color of law. The question was whether the county's negligent hiring, supervision and

14  monitoring of the defendant – an officer with a "considerable disciplinary record" – was the

15  proximate cause of the plaintiff's injuries. 92 F.3d at 837. The Court held that "Stanewich's

16  disciplinary record may have put his supervisors on alert that he could be violent and prone to

17  use excessive, even illegal, force while performing his duties. But the County could not

18  reasonably have foreseen that Stanewich would become a free-lance criminal and attack the Van

19  Orts as he did." *Id*.

20       In the present case, even if Georgopoulos's attack against Plaintiff was not under color of

21  law, the City should have reasonably foreseen that its actions in covering up Georgopoulos's

22  violent behavior, false claims, threatening behavior, harassment and other misdeeds would

23  contribute to Georgopoulos's continually growing sense of impunity. At least in *Van Ort*, the

24  county actually did sustain some of the complaints against the officer and eventually demoted

25  _____

26       [6]At least the City of Chicago, after learning of its officer's propensity for violence, had a
    psychological test conducted, and ultimately placed the officer on medical suspension. *Gibson,*
27  *supra*, 910 F.2d at 1512. In the present case, after Georgopoulos committed multiple acts of
    violence, the City of San Francisco has apparently responded by promoting him up the ranks of the
28  DPT.

1   him to narcotics in order to more closely monitor him. In this case, the City has deliberately

2   ignored or rejected virtually every complaint against Georgopoulos, making it reasonably

3   foreseeable that Georgopoulos would continue to hurt people. In other words, by acquiescing in

4   Georgopoulos's behavior, the City "set[ ] in motion a series of acts by others which the [city]

5   knows or reasonably should know would cause others to inflict the constitutional injury."

6   *Bateson*, 857 F.2d at 1304. Because the negligent hiring, retention and supervision of

7   Georgopoulos by the City was a proximate cause of Plaintiff's injuries (or there at least exists a

8   factual dispute about this issue), summary judgment is not properly granted in favor of the City

9   on Plaintiff's federal civil rights claims.

10   **CONCLUSION**

11       For all the foregoing reasons, Plaintiff respectfully requests that the Court deny

12   Defendants' motion for partial summary judgment as to Plaintiff's federal civil rights claims, and

13   further requests that the Court disqualify the San Francisco City Attorney's Office from further

14   representing Defendant Elias Georgopoulos in this matter.

16   Dated: August 20, 2010            LAW OFFICE OF JOSEPH S. MAY

20                           _____
                           JOSEPH S. MAY, Attorney for Plaintiff,

21                           ROGELIO HECHAVARRIA